# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ALBERTAS BANDŽIUS, | ) | |
| Plaintiff-Petitioner, | ) ) ) | |
| v. | ) ) | No. 18-CV-3811 |
| AISTE ŠULCAITĖ. | ) ) | Judge John J. Tharp, Jr. |
| Defendant-Respondent. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Albertas Bandžius seeks the return to Lithuania of his two sons, who have lived in Chicago since July 2014 with their mother, Respondent Aiste Šulcaitė. Bandžius filed a "Verified Complaint and Petition for Return of the Children" on May 31, 2018, pursuant to the Hague Convention on Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention"), Oct. 25 1980, T.I.A.S. No 11670, 1343 U.N.T.S. 89, enacted into law through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011 (2004). As relevant here, the Convention provides that a parent whose child has been wrongfully removed or retained in the United States may petition for the child's return to his or her country of habitual residence. Mr. Bandžius, a resident of Lithuania, alleges that Lithuania is the children's country of habitual residence and that Ms. Šulcaitė has wrongfully retained them in the United States since early July 2017.

As required by the Convention, the Court held expedited proceedings which culminated in an evidentiary hearing on September 24, 2018. Mr. Bandžius, Ms. Šulcaitė, and Mr. Velde (Ms. Šulcaitė's current husband) testified. The Court then interviewed the children *in camera*, outside

the presence of their parents, but with counsel present.[1] Based on the evidence adduced by the parties, the Court concludes that the children's country of habitual residence as of July 2017 was the United States and that Ms. Šulcaitė's retention of the children here since that time is not wrongful. The Court therefore denies Mr. Bandžius's petition and dismisses the complaint with prejudice.

## BACKGROUND

### I. Facts

Petitioner Albertas Bandžius and Respondent Aiste Šulcaitė were married in Lithuania in 2003. During their marriage, they had two children: D.B., born in 2004, and G.B., born in 2007. Unfortunately, the marriage broke down and the couple divorced in 2009. A local court in Lithuania subsequently issued a divorce decree which provided that the children were to live with Ms. Šulcaitė at her home in Vilnius, Lithuania. The decree also granted Mr. Bandžius various visitation and custody rights.

In Lithuania, Ms. Šulcaitė worked in the Presidential Protocol Division of the State and Diplomatic Protocol Department and was eligible to apply for positions abroad, which she did. In April 2014, Ms. Šulcaitė was notified that she was being transferred to the Lithuanian Consulate in Chicago, where she would begin work on July 14, 2014. Petitioner's Ex. BB. Ms. Šulcaitė informed Mr. Bandžius of her impending transfer and sought his agreement to have the children accompany her to Chicago.[2] Mr. Bandžius testified that Ms. Šulcaitė told him that the job position would last for three years. It was Mr. Bandžius's understanding that Ms. Šulcaitė would return to

---

[1] The parties agreed to the procedure for interviewing the children at the outset of the evidentiary hearing.

[2] The parties dispute the question of how much notice of her impending transfer to Chicago Ms. Šulcaitė gave to Mr. Bandžius, but resolution of that dispute is not material to the Court's decision.

Lithuania with the children when the three-year period expired in early July 2017. Ms. Šulcaitė denies promising to return by a specific date or that her employment was for a fixed period, though she conceded that a three-year term was typical and that, when she left Lithuania in 2014, she expected to return at some point. In any case, Mr. Bandžius did not affirmatively consent to the move. Ms. Šulcaitė, concerned that without a formal agreement Mr. Bandžius might be able to prevent her from taking the children to Chicago with her, applied to the District Court of Vilnius City in Lithuania seeking to amend the parties' divorce decree to allow her to move with the children to the United States. Petitioner's Exhibit B.

On June 27, 2014, the District Court of Vilnius City issued an order (the "June 2014 order") imposing "provisional measures of protection" in response to Ms. Šulcaitė's request. Specifically, the court acknowledged that Ms. Šulcaitė was going to the United States for a job and established the place of residence of the children "temporarily, until the [final] decision of the court in these proceedings, with [Ms. Šulcaitė], without indicating a particular address." Petitioner's Ex. D, Vilniaus Miesto Apylinkes Teismas 27.06.2014 [Decision of the District Court of Vilnius City of Jun. 27, 2014], No. N2-27162-859/2014. Although this order reflected the expectation that the term of Ms. Šulcaitė's employment in the United States would be three years, it did not impose a time-limit on Ms. Šulcaitė's right to retain the children with her in the United States or include any expiration date.

Ms. Šulcaitė and the children left for the United States in early July 2014. They moved into an apartment in Chicago and the boys enrolled in Ogden International School. Ms. Šulcaitė soon became involved in a relationship with David Velde, an American citizen she met through work. She testified that by August 2014, she was contemplating remaining in the United States permanently. Around April 2015, Ms. Šulcaitė and the children moved into Mr. Velde's residence

3

and the boys started attending a new school. Ms. Šulcaitė married Mr. Velde in May 2015. Their engagement and marriage cemented her intent to remain with the children permanently in the United States.

On January 26, 2015, the Vilnius district court issued its non-provisional decision (the "January 2015 order") regarding the amendment of the divorce decree. The court decided to amend the decree and establish the children's place of residence as with Ms. Šulcaitė "at the place of her residence." Petitioner's Ex. E, Vilniaus Miesto Apylinkes Teismas 26.01.2015 [Decision of the District Court of Vilnius City of Jan. 26, 2015], No. N2-231-859/2015. The order also laid out a procedure for Mr. Bandžius to interact with the children while they lived abroad. Recognizing that it was unclear when or even whether Ms. Šulcaitė planned to return, the court declined to set forth regulations concerning visitation rights for when or if the children moved back to Lithuania. *Id.* The district court concluded by noting that when its decision became effective, the interim measures of protection imposed by the June 27, 2014 order would be lifted. Mr. Bandžius promptly appealed the decision.

On April 8, 2015 while the appeal was pending, Mr. Bandžius filed another complaint in Vilnius District Court seeking to limit Ms. Šulcaitė's parental rights and establish the children's place of residence with him in Lithuania. Petitioner's Ex. H. He alleged that Ms. Šulcaitė was improperly limiting his ability to communicate with the boys, in violation of the divorce decree. In this complaint, Mr. Bandžius asserted, among other things, that Ms. Šulcaitė had told him that she did not intend to return with the children to Lithuania.

A year later in April 2016, the appellate court in Vilnius found that the January 2015 order was procedurally flawed for a variety of reasons. Petitioner's Ex. O. Consequently, it revoked the January 2015 order and remanded the case to the district court for rehearing. The appellate court

4

made no determination that Ms. Šulcaitė's removal or retention of the children was wrongful and did not address the preliminary June 2014 order, which remains in effect because the January 2015 decision was vacated.[3] The case is currently pending in the Vilnius district court.[4]

The children have resided in Chicago throughout the course of these proceedings. As of April 2015, they lived with their mother and Mr. Velde in a condominium in Niles, and as of June 2017, with their baby brother D.V. (the child of Ms. Šulcaitė and Mr. Velde). The boys are very attached to D.V. and help care for him. Since arriving, they have attended public schools taught in English, and have participated in a variety of extracurricular activities including karate, soccer, band, Lithuanian cultural school, and Lithuanian boy scouts. According to Ms. Šulcaitė, Mr. Velde, and the boys themselves, the boys are popular children who lead active social lives. Both children are fluent in English (and speak it predominantly) and doing well in school. D.B. is also fluent in Lithuanian, and while G.B. can understand it, he cannot speak it very well. They maintain ties to a number of relatives of their mother who also reside in the Chicago area, seeing them on holidays, birthdays, and other occasions. So far as the record reflects, neither child maintains significant communications with family (other than with their father and their paternal grandmother) or friends in Lithuania; Ms. Šulcaitė and D.B. stated that he has stayed in touch with only one of his friends there and G.B. has maintained ties with no one there. Indeed, G.B. has very little memory of his life in Lithuania given that he was only seven years old when he came to the

---

[3] As the January 2015 order lifted the provisional measures provided in the June 2014 order, the revocation of the January 2015 order presumably restored the case to the status quo before the January 2015 order was entered—meaning that the provisional measures continued to govern the rights of the parties under Lithuanian law. The petitioner has made no argument to the contrary; his argument is not that the June 2014 order is inapplicable but that it authorized Ms. Šulcaitė's retention of the children in the United States only for a term of three years.

[4] According to an August 2018 order from the Vilnius district court, the underlying custody case has been stayed at Mr. Bandžius s request until this Court issues its decision in this matter. Petitioner's Ex. Q. Mr. Bandžius's April 2015 complaint has been subsumed by that case.

United States.[5] Both children testified unequivocally that they did not want to return to Lithuania and preferred to remain in the United States. They have traveled extensively within the United States with their mother and Mr. Velde, including trips to Washington D.C., to a number of national parks, and several trips to Door County where the boys enjoy the water park, lighthouse tours, and eating cherry pie.

## II. Procedural History: Hague Petitions

While the underlying custody dispute wound its way through the Lithuanian court system, Mr. Bandžius initiated a separate set of proceedings under the Hague Convention. In November 2014, Mr. Bandžius filed his first Hague petition with Lithuania's State Child Rights Protection and Adoption Service under the Ministry of Social Security and Labor (Lithuania's "Central Authority")[6] alleging that Ms. Šulcaitė wrongfully removed the children from Lithuania. Respondent's Ex. 3. On December 15, 2014, Lithuania's Central Authority rejected Mr. Bandžius's petition, referring to the June 2014 preliminary custody order and noting that, in view of the June 2014 Order, "the departure of A. Šulcaitė with children to the United States with the permission of the court to live with her children in a foreign state cannot be considered illegal." Respondent's Ex. 5A.

On March 26, 2015 Mr. Bandžius filed a second Hague petition, which asserted that "the removal of [the] minor children from their permanent state of residence to another contracting state according to the Hague Convention and keeping them in that state is illegal." Respondent's Ex. 7.

---

[5] Mr. Bandžius argues that the boys' detachment from Lithuania is the result of Ms. Šulcaitė's efforts to undermine his relationship with them and failure to abide by the visitation requirements imposed by the January 2015 order. The evidence does not support the former claim and the latter holds no water in view of the fact that Mr. Bandžius secured the revocation of the January 2015 order.

[6] The Hague Convention requires each signatory country to designate a "Central Authority" to "discharge the duties which are imposed by the Convention." Art. 6, T.I.A.S. No. 11670.

6

This time, the Central Authority of Lithuania forwarded the petition in April 2015 to the Central Authority of the United States.[7] Petitioner's Response to Respondent's Supplement to Motion to Dismiss, 2, ECF No. 29.[8] Nevertheless, Mr. Bandžius did not institute any legal proceedings in the United States for more than three years. On May 31, 2018, Mr. Bandžius initiated proceedings in this Court seeking the return of his children under the Convention. Notwithstanding his assertions in his petitions to the Lithuanian Central Authority, in his Complaint, Mr. Bandžius makes no claim that Ms. Šulcaitė wrongfully removed the children when she moved to Chicago in July 2014. Nor does he argue that Ms. Šulcaitė's retention of the children in Chicago was wrongful during the next three years. Indeed, in the Complaint, Mr. Bandžius concedes that he "acquiesced" in Ms. Šulcaitė's retention of the children in the United States for a period of three years. Compl. ¶ 27. In this proceeding, Mr. Bandžius argues only that Ms. Šulcaitė has wrongfully retained the boys in the United States since early July 2017, when her temporary period of employment exceeded three years and she was allegedly required to return to Lithuania with the children. *Id.* at ¶¶ 24, 26.[9]

---

[7] Neither party has offered any explanation as to the reason the Lithuanian Central Authority forwarded this petition after having denied the first, but the question is immaterial in any event. Forwarding a request under the Convention implies no endorsement of the substantive merit of the claim of wrongful removal or retention; it merely recognizes that another contracting state has jurisdiction. *See* Hague Convention art. 9, T.I.A.S. No. 11670 ("If the Central Authority which receives an application referred to in Article 8 has reason to believe that the child is in another Contracting State, it shall directly and without delay transmit the application to the Central Authority of that Contracting State . . . .").

[8] Ms. Šulcaitė filed a motion to dismiss the complaint predicated on an argument that Mr. Bandžius was precluded from filing a second petition under the Convention by the Lithuanian Central Authority's refusal to forward his first petition to the United States Central Authority. Concluding that the first refusal was not a final judgment that would give rise to any sort of estoppel defense, the Court denied Ms. Šulcaitė's motion to dismiss at the outset of the evidentiary hearing.

[9] Mr. Bandžius's counsel confirmed this at the outset of the evidentiary hearing. Were Mr. Bandžius to make an argument that Ms. Šulcaitė wrongfully removed or retained the children before June 2017, it would make applicable the "settled" child defense under Article 12 of the Convention, which provides that where proceedings for return of a child are initiated more than one year after a wrongful removal or retention, the return of the child shall be ordered "unless it is

# DISCUSSION

The Hague Convention is an international treaty designed to deal with "the problem of international child abductions during domestic disputes." *Redmond v. Redmond*, 724 F.3d 729, 736 (7th Cir. 2013) (citing *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). It is based on the notion that "a child's country of habitual residence is best placed to decide upon questions of custody and access" *Whallon v. Lynn*, 230 F.3d 450, 456 (1st Cir. 2000). In accordance with that guiding principle, the Convention allows a parent to petition for the return of their child and "requires signatory countries to promptly return children to the country of their habitual residence when they are 'wrongfully removed to or retained in' another country." *Redmond*, 724 F.3d at 729. The Convention does not permit courts to resolve custody disputes on the merits; rather, it is designed to "restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Id.* at 739 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006).[10]

To prevail in an action for the return of a child, a petitioner must establish by a preponderance of the evidence that the child has indeed been wrongfully removed or retained.

---

demonstrated that the child is now settled in its new environment." By abandoning any claim of wrongful removal, and instead targeting Ms. Šulcaitė's retention of the children in the United Sates after July 2017, Mr. Bandžius renders the settled child defense unavailable as he initiated this suit less than one year after what he alleges to have been the wrongful retention.

[10] In this case, there is scant reason to believe that Ms. Šulcaitė is seeking to avoid a custody determination by Lithuanian courts. She has instituted no custody proceedings in the United States and has continued to appear (by counsel) and to litigate matters of custody in the Lithuanian courts. At the evidentiary hearing, her counsel confirmed that Ms. Šulcaitė's position is that custody issues will continue to be decided by the Lithuanian courts notwithstanding the continued presence of the children in the United States.

22 U.S.C. § 9003(e)(1)(A); *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 904 (N.D. Ill. 2015). Under the Convention, the removal or retention of a child is wrongful where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3, T.I.A.S. No. 11670. The treaty recognizes that "if a child is currently located in her habitual residence, her presence in the country (whether by removal or retention) is not wrongful." *Martinez v. Cahue*, 826 F.3d 983, 989 (7th Cir. 2016).

### I. Habitual Residence

Whether the removal or retention of a child is wrongful under the Convention depends on where the child was habitually resident "immediately before" any alleged breach of custody rights. Hague Convention art. 4, T.I.A.S. No. 11670. In fact, "the Convention may be invoked only where the child was habitually resident in a Contracting State and taken to or retained in another Contracting State." *Martinez,* F.3d at 989 (citing *Redmond*, 724 F.3d at 737). The pivotal issue before this Court, then, is whether D.B. and G.B. were habitual residents of Lithuania or the United States immediately before the alleged wrongful retention began in early July 2017 when, in Mr. Bandžius's view, Ms. Šulcaitė should have returned the children to Lithuania. If the children were habitual residents of Lithuania, then the Court must determine whether Ms. Šulcaitė's retention of them in the United States after the expiration of her three-year job placement is "wrongful," *i.e.* in breach of Mr. Bandžius's custody rights. If so, the children must be returned to Lithuania for the courts there to sort out the underlying custody dispute. On the other hand, if the children were

9

habitual residents of the United States by July 2017, the Convention would not apply; any retention here could not be wrongful. *Martinez*, 826 F.3d at 989.

The Convention does not define "habitual residence," but the Seventh Circuit has explained that "the search is for the place where the child has made his or her home . . . ." *Martinez* 826 F.3d at 990. Courts are to "account[] for all available relevant evidence and consider[] the individual circumstances of each case," but the two most important factors are the parents' last shared intent and the child's acclimatization to the proposed home jurisdiction. *Redmond*, 724 F.3d at 732. Further, a court should infer a change in habitual residence "only where it can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Martinez*, 826 F.3d at 990 (internal citations omitted). Based on the analysis below, the Court finds that D.B. and G.B.'s country of habitual residence as of July 2017 was the United States. Sending the children back to Lithuania would not be sending them home; after three years in which their lives were centered on their relationships, education, and activities in the United States, the dominant "family and social environment" in which their lives were framed was no longer Lithuania but the United States.

### A. Parental Intent

Courts consider the parents' last shared intent as to their child's country of residence because parents act as "surrogates" in cases where a young child "lacks the ability to truly acclimatize to a new environment." *Redmond*, 724 F.3d at 746 (citing *Holder v. Holder*, 392 F.3d 1009, 1016 (9th Cir. 2004). "[T]he concept of 'last shared parental intent' is not a fixed doctrinal requirement." *Id.* Further, "[t]he intention or purpose which has to be taken into account is that of

the person or persons entitled to fix the place of the child's residence." *Id*. at 747 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001)).

There is no dispute that by July 2017, Ms. Šulcaitė intended to remain in the United States with the children. Although she originally expected to return to Lithuania after her posting to Chicago, she testified that she began contemplating staying in the United States indefinitely as early as August 2014 when she met Mr. Velde. It is evident that by May 2015, when she married Mr. Velde, her intent to keep the boys in the United States permanently was settled and did not change thereafter. Mr. Bandžius does not in this proceeding allege that Ms. Šulcaitė 's removal of the children was wrongful or that she unlawfully kept the children in Chicago before that date; he expressly concedes in the complaint that he "acquiesced" in the children's presence in Chicago for the three years after Ms. Šulcaitė left Lithuania. Mr. Bandžius maintains, however, that he never agreed to let the children move to the United States permanently and always intended that they would return to Lithuania after three years. That means, he contends, that the parties never shared an intent to change the children's habitual residence from Lithuania to the United States.

But logic does not dictate that conclusion. As the Seventh Circuit held in *Koch v. Koch,* intent to change a child's habitual residence does not require an agreement to permanently relocate. 450 F.3d 703, 718. In that case, a family moved from the United States to Germany for an indeterminate period but "hoped to someday return to the United States." *Id.* at 716. The father later took the children back to the United States without the mother's knowledge or consent. *Id.* at 708. In holding that the children were habitual residents of Germany, the Seventh Circuit rejected the district court's assumption that the parents' shared hope to return to the United States meant they did not intend to abandon the United States as the children's habitual residence. *Id.* at 716. Instead, the court explained that "a person 'may effectively abandon a prior habitual residence

11

without intending to occupy the next one for more than a limited period.'" (citing *Mozes* 239 F.3d at 1075-76). In *Koch,* moreover, the Seventh Circuit endorsed the Third Circuit's holding that a father's acquiescence in a mother's move to Canada with their infant daughter for a period of two years demonstrated shared parental intent to abandon the United States as the child's habitual residence, notwithstanding their agreement that the move would be temporary and that the child was to return to the United States at the end of that period. The Seventh Circuit approvingly quoted the Third Circuit's reasoning:

> [T]he fact that the agreed-upon stay was of a limited duration in no way hinders the finding of a change in habitual residence. . . . Rather . . . the parties' settled purpose in moving may be for a limited period of time. Logic does not prevent us from finding that the shared intent of parents to move their eighteen-month old daughter to Canada for two years could result in the abandonment of the daughter's prior place of habitual residence. Put more succinctly, . . . the intent to abandon need not be forever . . . .

*Koch,* 450 F.3d at 716 (quoting *Whiting,* 391 F.3d at 550). The same principle applies to the situation here. That Mr. Bandžius intended the boys' home in the United States to be only temporary does not mean that their habitual residence could not become the United States; in acquiescing in the boys' residence in the United States for a period of three years, Mr. Bandžius acquiesced in a sea-change in the lives of his sons and it is reasonable to construe his acquiescence in their move to the United States, even if he believed it to be temporary, as acceptance that the boys' habitual residence—the place where the boys would be deemed home—would become the United States rather than Lithuania.

Further, courts "should look at actions as well as declarations" when determining parental intent, *Koch* 450 F.3d at 715, and Mr. Bandžius's conduct—specifically his delay in instituting this proceeding—provides further basis to infer that he acquiesced in a change in the boys' habitual residence. *See Guerrero v. Oliveros*, 119 F. Supp. 3d at 906 (considering a parent's failure to object to his children living in a different country as evidence of intent that the children live in that

country). Mr. Bandžius filed his second Hague Petition, which alleged wrongful retention, in late March 2015. The Central Authority of Lithuania forwarded the petition to the Central Authority of the United States by April 10, 2015. Respondent's Ex. 5. Yet, Mr. Bandžius did not initiate this proceeding until May 31, 2018, more than three years later. When questioned about the delay, Mr. Bandžius explained that he knew a wrongful removal action would be futile; he wanted to wait until Ms. Šulcaitė's temporary job position expired in early July 2017 to pursue a wrongful retention action. But Mr. Bandžius knew of Ms. Šulcaitė's plans as early as April 2015, when he filed a pleading in his suit against her in Lithuania acknowledging that she had already told him that she did not intend to return with the children to Lithuania. *See* Petitioner's Ex. H (complaint authored by Mr. Bandžius submitted to Lithuanian court acknowledging that Ms. Šulcaitė "is not going to return with the children"). Mr. Bandžius might, therefore, have filed a wrongful retention claim in the United States at that point. And even if it would have been premature to do so, Mr. Bandžius continued to delay the filing of a complaint seeking the return of the children to Lithuania well after the three-year mark of their residency in the United States. Instead of filing his Complaint in this Court immediately in July 2017 at the end of the three-year period to which he acquiesced, Mr. Bandžius waited almost another year before filing his Complaint seeking the boys' return. Mr. Bandžius's delay and inaction while knowing that Ms. Šulcaitė did not intend to return the boys to Lithuania undermines, to some extent, the credibility of his claim that he never intended to permit the children to remain in the United States for more than three years. Having acquiesced in the children's residence in the United States for years before filing this suit, the depth of Mr.

Bandžius's concern about preserving Lithuania as the boys' habitual residence may reasonably be questioned.

But even taking Mr. Bandžius's testimony at face value, his stated intent has minimal bearing on the habitual residence determination because "shared intent has less salience when only one parent has the legal right" to determine residence. *Redmond*, 724 F.3d at 747. Take, for example, the Seventh Circuit's *Martinez* decision. In that case, a mother moved with her child from the United States, where the father resided, to Mexico. When the child went to visit his father a year later, the father retained him in the United States without the mother's permission. The mother subsequently filed a petition under the Convention for the child's return to Mexico. *Martinez*, 826 F.3d at 988. In the court's habitual residence analysis, it found that the petitioner's initial removal and retention of the child in Mexico was not subject to any legal restrictions. *Id.* at 992. Although the father had visitation rights, they were merely rights of access that did not "trigger the remedy of return under the Convention." *Id.* at 991. Accordingly, because he had "no legal right to decide [the child's] residence," his intent did not affect the analysis. *Id.* at 992.

In this case, the June 2014 order gave Ms. Šulcaitė the exclusive right to determine the residence of D.B. and G.B. Therefore, like the petitioner in *Martinez*, her intent is the only intent with legal significance. Mr. Bandžius counters that he has custody rights within the meaning of the Convention because the 2009 divorce decree gave him the equal right "to take part in the upbringing and development of the under-aged children." Petitioner's Argument in Support of Petition for Return of the Children 21, ECF No. 15. He further contends that the June 2014 order did not alter these rights or give Ms. Šulcaitė the right to determine the permanent residence of the

14

children; in his view, it simply authorized Ms. Šulcaitė to take the children to the United States for a temporary period of three years. *Id.* at 20.

The June 2014 order, however, *did* alter Mr. Bandžius's rights. Upon an application by Ms. Šulcaitė to amend the divorce decree, the Lithuanian court entered a provisional measure of protection and "established the place of residence of minor children [G.B. and D.B.] temporarily, ***until the decision of the court in these proceedings***, with [Ms. Šulcaitė], without indicating a particular address." Petitioner's Ex. D (emphasis added). Essentially, the court established the children's place of residence as with Ms. Šulcaitė, wherever she may live, until further court order. While this Court is mindful that the Vilnius district court clearly premised its June 2014 order on an assumption that Ms. Šulcaitė would eventually return to Lithuania, nothing in its text requires her to return by a specific date and no further order imposing such a return requirement has been issued.[11]

Unlike the respondent in *Martinez*, then, Ms. Šulcaitė appropriately "obtained a custody order during the time that mattered" which superseded the divorce decree and gave her the exclusive right to determine the children's residence until further notice. 826 F.3d at 990. Because parental intent is "less salient" where only one parent has the right to determine a child's residence, and because, in any event Mr. Bandžius acquiesced in the boys' residence in the United States for years, the Court places more weight in this case on the children's acclimatization to the United

---

[11] During closing arguments at the hearing, the Court asked Petitioner's counsel to identify any provision of the June 2014 Order that limits its duration to three years; effectively acknowledging that there is none, counsel premised Petitioner's view that Ms. Šulcaitė was required to return the boys to Lithuania after three years only on the expectation that Ms. Šulcaitė's posting to the Consulate in Chicago would be for no more than three years.

15

States as addressed below. *See id.* (stressing that whether to emphasize the parents' perspective over the child's acclimatization is dependent on the circumstances).

**B.     Acclimatization**

The Court easily concludes that both D.B. and G.B. were fully acclimated to the United States by July of 2017. Whether a child is "acclimated" depends on the extent to which his or her life is "firmly embedded" in the new country. *Redmond*, 724 F.3d at 746 (7th Cir. 2013) (citing *Mozes* 239 F.3d at 1078). The evidence presented shows that, immediately prior to the alleged wrongful retention in July 2017, the children considered the United States to be their home. They were living with their mother, Mr. Velde, and D.V., their new baby brother, as a family unit. By that time, they had been enrolled in local, English-speaking schools for three years and spoke English fluently. Ms. Šulcaitė and Mr. Velde both testified that D.B. and G.B. were doing well in school. The children were participating in numerous extra-curricular activities, including band, soccer, and karate. For holidays, the boys spent time with extended family living nearby. Both boys had already made many friends. In other words, by July 2017 they exhibited "all of the indicia of habitual residence, including friends, extended family, success in school, and participating in community . . . activities." *Martinez*, 826 F.3d at 992.

Mr. Bandžius's principal argument to the contrary is that the children have spent most of their lives in Lithuania. That is true as a matter of arithmetic, but if that fact were dispositive, it would "create the kind of formulaic, ratio-based test that appears nowhere in the Convention." *Id.* In *Martinez*, for example, the Seventh Circuit upheld the finding that the nine-year old child in question had fully acclimated to life in Mexico after spending only a year there after living the first eight years of his life in the United States. By contrast, the three years D.B. and G.B. spent in the United states before July 2017 constituted a much larger portion of their lives (roughly 23% and

16

30%, respectively). In any event, far more important than the proportion of a child's life spent in a retaining state is the depth and quality of the time spent there. It is significant in that regard to note that D.B. and G.B. are not infants; during their residence in the United States, both boys have been of an age when they have been "able to form meaningful connections with the people and places [they] encounter[] each day." *Whiting,* 391 F.3d at 551. And here, there can be no serious dispute—and Mr. Bandžius offers no contrary evidence—that by July 2017 D.B. and G.B. were fully engaged and invested in their lives in the United States and largely detached from their lives in Lithuania. In this regard, the Court places great weight on the children's own testimony, which indicates that are happy with, and well-adjusted to, their lives in the United States and have maintained relatively few connections to their old lives in Lithuania. Indeed, G.B. can hardly remember living there at all. All of this confirms that the children are fully acclimated to life in the United States.

In view of the limited weight to be given to Mr. Bandžius's stated intent regarding the boys' habitual residence given his acquiescence to their residence in the United States for three years and the judicial authorization Ms. Šulcaitė obtained to move the boys to Chicago, the lesser weight to be accorded to parental intent in any event given the boys' ages, and the clear and effectively undisputed evidence that the boys are well acclimated to life in the United States, the Court easily concludes that, as of July 2017, the United States was the children's country of habitual residence. Because a child's presence in his or her country of habitual residence—whether by removal or retention— is not wrongful, the Court denies Mr. Bandžius's petition for return of the children to Lithuania.

## II. Mature Child Exception

The Hague Convention's "mature child exception" provides an additional ground for denying Mr. Bandžius's petition. The mature child exception states that a judicial body may refuse to order the return of the child if it finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13 T.I.A.S. No. 11670. Whether a child is sufficiently mature is a fact-intensive determination "to be made on a case-by-case basis" and does not depend on a child reaching a specific age. *Guerrero*, 119 F. Supp. 3d at 914 (citing *Yang v. Tsui*, 499 F.3d 259, 279 (3rd Cir. 2007). Additionally, a "generalized preference to remain in one country" is typically "insufficient to invoke the application of this exception." *Id.* Instead, a child must voice "particularized objections to being returned." *Id.* Finally, courts "must be attentive to the possibility" that a child's opinion could be unduly influenced by the custodial parent. *Walker v. Walker*, 701 F.3d 1110, 1123 (7th Cir. 2012).

Based on the Court's observations during it is *in camera* interview of the children, the Court has no difficulty in concluding that the children are mature enough to have their opinions considered. Though age is not dispositive, D.B. and G.B. are both at an age—as their mother testified—that they are capable of forming their own opinions and attitudes about what they want to do and with whom. Further, both 13-year-old D.B. and 11-year-old G.B. were polite and articulate during their interviews. Both knew what it meant to tell the truth and appeared to understand the importance of doing so. *See Anderson v. Acree*, 250 F.Supp.2d 876, 883–84 (S.D. Ohio 2002) (eight-year-old girl sufficiently mature where, among other things, she "indicated her understanding of the difference between truth and falsehood and of her obligation to tell the truth"). Unlike one case where the court found that an eight-year-old boy was "preoccupied, disinterested,

and detached" and thus not sufficiently mature, both D.B. and G.B. were attentive and focused throughout the interview. *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). They also clearly understood the nature and purpose of the court proceeding, recognizing that a determination about whether they would remain in the United States or return to Lithuania was in the offing, and took it very seriously.

As for the boys' opinions, D.B. and G.B. unequivocally objected to returning to Lithuania. G.B. explained that he did not want to leave his friends, school, or extended family to "start all over again" in Lithuania. D.B. voiced similar concerns about leaving friends and missing out on opportunities in the United States. One might argue that these are the type of general preferences insufficient to invoke the mature-child exception. *See Yang*, 499 F.3d at 279 (affirming district court's finding that ten-year-old girl's affinity for school, preference for living in a house rather than an apartment, and desire to stay with friends and family "did not include particularized objections" sufficient to invoke the exception). It is clear, however, that the boys' objections were much more deeply held than a generalized preference for one location over the other. Specifically, it was clear that both boys objected to returning to Lithuania because it would destroy the fabric of their present family life. The boys recognized that return to Lithuania might require them to live with their father and both became emotional and visibly upset at the prospect of having to do so. (The boys' objections to living with their father in Lithuania are also documented in records of counseling sessions the boys have attended to address the anxiety that the ongoing litigation has produced.) D.B. acknowledged that he had told his mother that he "might hurt himself" if he had to move back to Lithuania, and G.B. recognized that having to return to Lithuania would disrupt his ties to his family, particularly his new baby brother. These were not indicators of a casually-

held preference for one location or another but of recognition that their lives would be upended by an order returning them to Lithuania.

Finally, while living with their mother has no doubt affected their opinions to some extent, the Court finds no basis to conclude that Ms. Šulcaitė has exercised any undue influence on the children. Both children told the Court that their mother instructed them only to "be confident" and "tell the truth." Absent any evidence to the contrary, the Court credits their testimony. The Court finds that D.B. and G.B. have "attained an age and degree of maturity at which it is appropriate to take account of [their] views," art.13, and the mature child exception therefore applies and provides another basis for denying Mr. Bandžius's petition.

\* \* \*

After living in the United States since July 2014, there is no question that D.B. and G.B. are "home" in Chicago. Notwithstanding Mr. Bandžius's belated efforts to challenge the boys' continued residence here, the United States became their habitual residence during the period in which he acquiesced in their presence here. Accordingly, and for all of the reasons discussed above, the Court denies Mr. Bandžius's petition for return of his minor children to Lithuania.

Date: October 15, 2018

John J. Tharp, Jr.
United States District Judge